UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
DOLLAR PHONE CORP., et al.,

                     Plaintiff,

  - against -

DUN & BRADSTREET CORP., et al.

                     Defendants.
----------------------------------------------------------x

MEMORANDUM AND ORDER

09 Civ. 3645 (ILG) (SMG)

GLASSER, Senior United States District Judge:

This action is a reminder of the adage that "people who accept an offer assume the risk of unread terms that may prove unwelcome." Schnabel v. Trilegiant Corp., 697 F.3d 110, 123 (2d Cir. 2012) (quotation omitted). Plaintiffs Dollar Phone Corp. ("Dollar Phone") and parent company Global Switching, Inc. ("Global Switching," collectively "plaintiffs") bring this class action on behalf of themselves and a putative class for breach of contract and unjust enrichment against Dun & Bradstreet Corp. and Dun & Bradstreet, Inc. (collectively, "D&B" or "defendants") arising from the purchase by plaintiffs of a D&B service, ScoreBuilder. Currently before the Court is D&B's motion for summary judgment on these claims. For the reasons that follow, D&B's motion is hereby GRANTED.

## I. BACKGROUND

Unless otherwise noted, the following facts are undisputed. Dollar Phone purchases wholesale "air time" (minutes of speaking over the phone) from hundreds of vendors and resells them to other carriers. Plaintiffs' Statement of Facts Pursuant to Local Civil Rule 56.1 in Opposition to Defendants' Motion for Summary Judgment dated June 18, 2012 ¶ 1 ("Pls.' 56.1 Opp'n") (Dkt. No. 89-1); Declaration of Jason Halper dated

1

April 20, 2012 ("Halper Decl."), Ex. B (Del Cielo Dep.), at 47-48 (Dkt. No. 69-2). Dollar Phone is owned by parent company Global Switching, and both are Brooklyn-based New York corporations. Halper Decl., Ex. B (Del Cielo Dep.), at 12-13. D&B is a New Jersey-based Delaware corporation that maintains credit reports, financial performance figures, and a plethora of scores and ratings on companies that help assess the credit risk of those companies. Defendants' Local Rule 56.1 Statement of Undisputed Material Facts dated April 20, 2012 ¶¶ 2-3 ("Defs.' 56.1") (Dkt. No. 67-2); Pls.' 56.1 Opp'n ¶¶ 2-3. D&B calculates some of these scores based on payments to companies' vendors. Approximately 8,000 vendors automatically report payment experiences to D&B, and D&B terms these reports "trade tape." Defs.' 56.1 ¶¶ 4, 7; Pls.' 56.1 Opp'n ¶ 4.

During all times relevant to this action, D&B sold a product called ScoreBuilder both through its small business website and over the phone. Affirmation of Peretz Bronstein dated March 2, 2012 ("Bronstein Aff."), Ex. 1 (Dkt. No. 71-5); Halper Decl., Ex. B (Del Cielo Dep.), at 96-98. In June 2005, Dollar Phone purchased ScoreBuilder from D&B for $399; it bought the product again in October 2007 for $404.10 and yet again in January 2009 for $437.94. Defs.' 56.1 ¶¶ 16, 18.[1] Global Switching also purchased ScoreBuilder in 2006, 2007, and 2009. Id. ¶ 17. Dollar Phone director of

---

[1] Plaintiffs have limited their lawsuit to "products that D&B sold during the relevant time period, from 2005 through 2009," and do not claim damages for 2007 or 2008. Third Amended Complaint dated July 23, 2012 ("Compl.") ¶ 1 (Dkt. No. 93); Pls.' 56.1 Opp'n ¶ 33. While both parties discuss events outside this time period in their filings, those events are not relevant to this action. Additionally, although plaintiffs claim that "[t]his class action concerns ScoreBuilder and CreditBuilder," they do not allege that they purchased CreditBuilder in the relevant time period. Id. Therefore, all claims regarding CreditBuilder are dismissed. Finally, the reasons why plaintiffs purchased ScoreBuilder are not relevant to the existence and interpretation of the contract at issue in this action. Defs.' 56.1 ¶¶ 30-32; Pls.' 56.1 Opp'n ¶¶ 30-32 & n.4.

2

human resources Jennifer Del Cielo ("Del Cielo") repeatedly purchased ScoreBuilder over the phone without ever having read D&B's website or any other material. Halper Decl., Ex. B (Del Cielo Dep.), at 9, 96-100. Each purchase was memorialized in the following email ("purchase email") sent from D&B to Del Cielo:

> Thank you for your purchase of ScoreBuilder.
>
> ScoreBuilder enables you to submit up to six trade references to D&B <u>which we will attempt to convert into payment experiences</u>. <u>Verified</u> experiences will then be added to your D&B credit file to improve the accuracy of your scores and ratings. You may have already started to provide us with trade references at the time of purchase.
>
> You will also be receiving:
> - An email containing a link to provide us with additional references
> - An initial snapshot of your business credit file (Business Information Report) updated to reflect the most recent information you provided to D&B
> - <u>Periodic status emails to track the progress of your trade references</u>
> - A SelfMonitor report, which enables you to view the most up-to-date information in your credit file, will be delivered once D&B has resolved the trade references provided . . .
>
> If you have any questions or need assistance, <u>feel free to call our Client Services Team toll free at 1-(800)333-0505</u>, Monday through Friday 8:00 AM to 6:00 PM Local Time, or <u>email us at sbsSupport@dnb.com</u>.

Halper Decl., Ex. G; Bronstein Aff., Exs. 31-32 (emphasis added).

D&B's policies placed qualifications upon converting trade references to payment experiences. Defs.' 56.1 ¶ 12. Those are, for example, D&B does not accept trade references that were already reported as trade tape; trade references from vendors that have not been in D&B's database for at least twelve months; trade references from outside the United States; or trade references from banks, landlords, or utilities. Id. ¶¶ 12-14; Pls.' 56.1 Opp'n ¶¶ 7-9. As a result, many trade references submitted by

3

ScoreBuilder purchasers do not qualify as payment experiences. Bronstein Aff., Exs. 12, 34-36. These trade reference qualifications are not described by D&B, and although Del Cielo regularly spoke to D&B representatives, she never asked what types of references are converted into payment experiences. Defendants' Responses to Plaintiff's Additional Statement of Facts under Local Rule 56.1 dated July 5, 2012 ("Defs.' 56.1 Reply") ¶ 49 (Dkt. No. 83); Halper Decl., Ex. B (Del Cielo Dep.), at 146.

In 2005, in accordance with the terms of their purchase as provided in the email, supra, Dollar Phone submitted eleven trade references to D&B, and D&B accepted two of those submissions. Bronstein Aff., Ex. 33. In response to the receipt of such a reference, D&B sent a confirmation email ("submission email") that provided, in relevant part:

> 2/3/2009
>
> Dear JENNIFER DELCIELO,
>
> Thank you for your recent credit reference submission for your ScoreBuilder Solution you purchased on 01/27/2009 . . . . You may submit 5 additional credit references[] by clicking on the following secure link (or by copying the secure link into your website browser) . . . . <u>To check the status of your submitted payment references, please click the following link</u> (or copy the link into your web browser).

Halper Decl., Ex. I (emphasis added).[2] In 2006, Global Switching submitted seven trade references, three of which were accepted. Declaration of Duane Deitrich dated April 20, 2012 ("Deitrich Decl."), Ex. D (Dkt. No. 66-4). In 2009, Dollar Phone submitted five trade references, only one of which was accepted. Bronstein Aff., Ex. 33.

---

[2] Although this email refers to "payment references," all parties refer to submissions as "trade references."

Global Switching submitted one trade reference to D&B in 2009, which was accepted. Defs.' 56.1 ¶ 35.

At some point in 2009, a D&B representative informed Del Cielo that D&B had rejected many of plaintiffs' submitted trade references. Halper Decl., Ex. B (Del Cielo Dep.), at 113-14, 150-52. When Del Cielo requested an explanation, D&B sent Del Cielo an email listing the reasons it rejects trade references on July 6, 2009. Affirmation of Jennifer Del Cielo ("Del Cielo Aff.") dated June 18, 2012 ¶ 2 (Dkt. No. 80-2); Bronstein Aff., Ex. 22. In that regard, it should be noted that the submission email invites the plaintiff to check the status of their submissions. Halper Decl., Ex. I.

On July 16, 2009, plaintiffs commenced this action in state court, which defendants removed to federal court on August 21, 2009. Notice of Removal (Dkt. No. 1). In pretrial litigation, the case was limited to breach of contract and unjust enrichment claims based on D&B's website and the purchase emails. Dkt. Nos. 25, 33, 92-93. On April 20, 2012, D&B moved for summary judgment on plaintiffs' claims. Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment (Defs.' Mem.) (Dkt. No. 67-1). On June 18, 2012, plaintiffs filed their opposition to defendants' motion, Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Opp'n") (Dkt. No. 89), and on July 3, 2012 D&B filed its reply. Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment ("Defs.' Reply") (Dkt. No. 81).[3]

---

[3] Despite defendants' protestations, Defs.' Reply at 2-6, plaintiffs may base their claims on the purchase emails because Magistrate Judge Gold permitted them to amend the Complaint to reference them. Dkt. No. 92. The Court declines to consider the parties' many letters, submitted both before and after oral arguments, in light of

5

## II. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation omitted).

The moving party bears the burden of establishing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986), and cannot "rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation omitted).

A court deciding a motion for summary judgment must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation omitted). In cases that involve the interpretation of a contract, such as this one, summary judgment is appropriate only if the language of the contract is plain and unambiguous, considered in light of the context and structure of

---

Magistrate Judge Gold's requirement that plaintiffs submit no additional briefing. Dkt. Nos. 96-99, 101-02.

the agreement as a whole. Dell's Maraschino Cherries Co., Inc. v. Shoreline Fruit Growers, Inc., 887 F. Supp. 2d 459, 469 (E.D.N.Y. 2012).

## B. Breach of Contract Claim

Plaintiffs allege that D&B promised to permit plaintiffs to submit up to six trade references to improve their credit scores in return for purchasing ScoreBuilder. Plaintiffs claim that D&B broke this promise by rejecting many of their submitted trade references based on undisclosed restrictions, rendering ScoreBuilder worthless. Compl. ¶¶ 2, 17-19; Hr'g Tr. 8-10, Nov. 13, 2012; Halper Decl., Ex. B (Del Cielo Dep.), at 52-55, 71-72, 107-08, 145-46. Plaintiffs seek "reimbursement or refund of the value they did not receive" on behalf of themselves and the putative class of ScoreBuilder purchasers. Compl. ¶ 39.

In order to recover for breach of contract under New York law, "a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011).[4]

It is beyond dispute that plaintiffs contracted with D&B when they purchased ScoreBuilder over the phone.[5] Plaintiffs manifested their offer when Del Cielo called

---

[4] Because this is a diversity case, New York law applies. See, e.g., Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941). The parties do not dispute that New York contract law governs.

[5] To the extent plaintiffs rely upon D&B's website to fix the terms of the contract, Compl. ¶¶ 12, 25, Ex. A, Del Cielo testified that she never read D&B's website prior to purchasing ScoreBuilder, Halper Decl., Ex. B (Del Cielo Dep.), at 98, so the website has

D&B to purchase ScoreBuilder, and D&B's acceptance of that offer is manifested by the email, supra, "Thank you for your purchase of ScoreBuilder." Plaintiffs accepted that the purchase emails provided the terms of the contract by performing the contract under those terms, i.e. submitting trade references, not objecting to the terms of the email, and twice reordering ScoreBuilder. See Schnabel, 697 F.3d at 119-20 ("[A] contract is formed when parties assent through written or spoken words or by other acts or failure to act." (internal quotation omitted)). Indeed, plaintiffs' action against defendants for breach of contract is a tacit acknowledgment of the formation of a contract, and their claim that the contract was breached is a tacit acknowledgment and understanding of its terms and an assertion of defendants' failure to perform them.

"When interpreting a contract, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized." G3-Purves Street, LLC v. Thomson Purves, LLC, 953 N.Y.S.2d 109, 112 (2d Dep't 2012) (internal quotations omitted). The terms of the contract encompass parties' "obligation to exercise ordinary diligence to inquire and, if necessary, to seek proper assistance . . . to ascertain and understand the [contractual] terms." Hotel 71 Mezz Lender LLC v. Falor, 882 N.Y.S.2d 414, 415 (1st Dep't 2009).

---

no relevance to the formation of the contract. See Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 401-02 (2d Cir. 2004) (citing Specht v. Netscape Commc'ns Corp., 306 F.3d 17 (2d Cir. 2002) (Sotomayor, J.)); 1 Richard A. Lord, Williston on Contracts § 4:16 (4th ed. 1991) ("As a general principle, an offeree cannot actually assent to an offer unless the offeree knows of its existence."). In any event, D&B's website does not meaningfully differ from the purchase emails. Bronstein Aff., Ex. 1.

Plaintiffs' reliance upon an assertion that they purchased "a pig in a poke" is unpersuasive. Compl. ¶ 17; Pls.' Opp'n at 7. The purchase emails explicitly notified plaintiffs that D&B will "<u>attempt</u> to convert into payment experiences" trade references plaintiffs submit. Those references, the emails go on to convey, will be "verified." Plaintiffs' actual notice of these terms is sufficient to make a reasonably prudent person aware that D&B does not simply accept all submitted trade references. <u>See</u> Defs.' Mem. at 21; Defs.' Reply at 9.[6] Yet Del Cielo testified that she "assume[d] that everything will be accepted," and never "ask[ed] any of the D&B representatives what types of references would be acceptable," despite having "multiple conversations with them over the years." Halper Decl., Ex. B (Del Cielo Dep.), at 146. Plaintiffs' "decision not to inquire as to the terms and conditions is one by which they are bound," <u>Movado Grp., Inc. v. Mozaffarian</u>, 938 N.Y.S.2d 27, 28-29 (1st Dep't 2012), and plaintiffs' renewal of ScoreBuilder in 2007 and 2009 plainly manifest satisfaction with its terms. <u>See Register.com</u>, 356 F.3d at 401-02 (imputing knowledge of terms based on repeated dealings).

Plaintiffs' assertion that they were unaware of D&B's restrictions is similarly unavailing. Pls.' Opp'n at 1, 6-11. The purchase emails clearly state that plaintiffs will receive "[p]eriodic status emails to track the progress of [their] trade references." No evidence is provided by either party regarding this provision.[7] If status emails were

---

[6] The conspicuousness of these terms in a one page email that plaintiffs received three times distinguishes this case from <u>Schnabel</u>, where the disputed terms were buried in the thirteenth paragraph of a lengthy email. 697 F.3d at 123 n.14.

[7] Although Del Cielo testified that she was not aware of any way to track credit references other than calling D&B, Halper Decl., Ex. B (Del Cielo Dep.), at 114-15, this is contradicted by the submission email. Halper Decl., Ex. I. Hari Ganapathy, D&B's

9

received, then plaintiffs were presumably informed of the status of their trade references. If status emails were not received, then there is no evidence that plaintiffs ever inquired into why they were not. The emails expressly invited plaintiffs to "feel free to call" should they "have any questions or need assistance." Yet Del Cielo testified that she never made such inquiries, which a reasonably prudent person would have made, or accepted the invitation extended by D&B to call about ScoreBuilder. Halper Decl., Ex. B (Del Cielo Dep.), at 146. When Del Cielo learned about D&B's restrictions in 2009 and requested an explanation, D&B emailed Del Cielo a list of its internal restrictions on trade references shortly thereafter. Del Cielo Aff. ¶ 2; Bronstein Aff., Ex. 22. Thus, the introductory adage may be modified to provide that people who accept an offer assume the risk of failing to inquire of the meaning of words in the offer that they read, especially when they repeatedly renew the contract. See Schnabel, 697 F.3d at 120-23; Hotel 71, 882 N.Y.S.2d at 415 (holding that a party cannot claim ignorance of contractual terms after failing "to make inquiry"); see also WC Capital Mgmt., LLC v. UBS Sec., LLC, --- F.3d ----, 2013 WL 1285870, at *7 (2d Cir. Apr. 1, 2013) (holding that failure to follow up on a "clear invitation" to obtain information constitutes disclosure). Therefore, plaintiffs had inquiry notice of D&B's restrictions.

Accordingly, the Court grants defendants' motion for summary judgment on plaintiffs' breach of contract claim.

**C. Unjust Enrichment Claim**

---

product manager for ScoreBuilder, also testified that he could not be certain whether plaintiffs received status update emails. Bronstein Aff., Ex. 7 (Ganapathy Dep.), at 28, 47-49. In any event, plaintiffs do not allege that D&B breached the contract by failing to provide status emails.

Under New York law, "the court should treat the claims for unjust enrichment only if it first determines that no contractual relationships exist." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573, 586 (2d Cir. 2006).  Because the Court finds that parties entered into valid contracts, plaintiffs cannot maintain a claim for unjust enrichment.  Accordingly, the Court grants defendants' motion for summary judgment on plaintiffs' unjust enrichment claim.

### III.   CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED.

SO ORDERED.

Dated:     Brooklyn, New York
           April 5, 2013

                                          /s/
                              I. Leo Glasser
                              Senior United States District Judge